# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| Christine Underwood | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | No. 15 CV 50249 |
|  | ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) |  |
| Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christine Underwood brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits for the discrete period from March 7, 2012 (her alleged onset date) until August 1, 2013 (the date she was found disabled by the administrative law judge). This appeal only concerns the relatively narrow issue of whether she should receive benefits for this 17-month period.

Because the legal issues as presented in the briefs are relatively confined, the Court will only provide a brief overview of the medical and procedural history. On May 17, 2012, plaintiff filed her disability application, alleging mental and physical impairments. These impairments seemed to emerge after a car accident in 2007 and after a series of strokes (or mini-strokes) beginning in 2010. She suffers from hip pain and right-sided weakness causing difficulties in standing or walking and also from anxiety, depression, memory and concentration difficulties, as well as PTSD from the fact that a 17-year girl was killed in the car accident. These problems eventually caused her to stop working as a supervisor of a three-person cleaning crew at a medical facility.

1

A hearing was held before the administrative law judge (ALJ) on December 2, 2013. Plaintiff, then 54 years old, testified about the above impairments. Two medical experts also testified. Dr. Michael Cremerius, a psychologist, testified about plaintiff's psychological and cognitive problems and found that she could work, but should be limited to simple repetitive tasks with only occasional contact with coworkers, supervisors, and the public. Dr. Hugh Savage testified that plaintiff's physical residual functional capacity ("RFC") would allow her to do "reduced light" work, subject to certain conditions about siting, standing, and walking. A vocational expert, Edward Pagella, also testified.

On May 29, 2014, the ALJ found, as noted above, that plaintiff was disabled as of August 1, 2013 but not for the 17-month period before then.[1] This two-part finding was affected, in part, by the way plaintiff's age category changed under the specific Medical-Vocational Rules at issue. The ALJ found that, during this 17-month period, plaintiff had the RFC to perform light work, subject to a number of exceptions including specific hourly limitations (6 hours sitting and 6 hours standing or walking, consisting of 2 hours standing and 4 hours walking). R. 15.

In this appeal, plaintiff raises two arguments focused only on the 17-month period.[2] Plaintiff's first argument is that the ALJ never explained why he found plaintiff's credibility was lacking and improperly relied on a boilerplate sentence. An ALJ's credibility determination should be reversed only if it is patently wrong. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*

---

[1] The ALJ found that plaintiff suffered the following severe impairments: "a cognitive disorder; depression; anxiety; complex partial seizure disorder; asthma; gastroesophageal reflux disease; obesity; hypertension; headaches; a cerebrovascular accident; and transient ischemic attacks." R. 14.
[2] Neither side raises any issues about the finding of disability beginning on August 1, 2013, and this issue therefore should not be re-assessed or changed on remand.

2

At the start of the RFC analysis, the ALJ stated the following: "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in the decision." R. 16. There is no dispute that this statement is boilerplate. At issue is whether the "reasons" alluded to in this sentence were sufficiently "explained" in the ensuing discussion. In its response brief, the Government discusses some of the evidence later mentioned by the ALJ, such as several "normal" findings during an office visit, and argues that this evidence indirectly reveals the ALJ's broader credibility rationales. In making this argument, the Government concedes that, aside from the one sentence quoted above, the ALJ *nowhere in the opinion* formally or explicitly analyzed plaintiff's credibility. Therefore, Government is arguing that the ALJ's credibility reasons are implicit in the opinion, which is sufficient.

This Court is not persuaded by this argument. As one simple but important test of this argument, the Court notes that, after reading the entire opinion, it is not confident that it knows what the ALJ's credibility rationales were or how the ALJ reached them. The ALJ's RFC discussion is largely a narrative summary of medical visits with little formal analysis. Although the Court could speculate based on a few passing phrases and cryptic references, the Court would ultimately be guessing at the precise rationales. Accordingly, the ALJ's opinion fails to comply with the basic precept in Social Security law that an ALJ must build a logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build such a logical bridge). This principle applies also to the specific area of credibility determinations. *See Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing

body to understand the reasoning"); *Bjornson v. Astrue*, 671 F.3d 640, 649 (7th Cir. 2012) ("the [ALJ's] opinion failed to build a bridge between the medical evidence (along with Bjornson's testimony, which seems to have been fully consistent with that evidence) and the conclusion that she is able to work full time in a sedentary occupation provided that she can alternate sitting and standing").

Moreover, the ALJ's credibility analysis is opaque in another sense, one not addressed by the Government. The ALJ found that plaintiff's testimony was not "entirely credible." The qualification "entirely" suggests that some of testimony was credible, which naturally leads to the question of which part was credible and which part was not credible. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010 ("The statement by a trier of fact that a witness's testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony."). The opinion does not answer this question either.

The main problem with the Government's attempt to explain why the ALJ's credibility decision was justified is that it violates the *Chenery* doctrine by relying on after-the-fact justifications not explicitly relied on by the ALJ. *Parker*, 597 F.3d at ("the *Chenery* doctrine [] forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced"). The Government's brief attempts to fill in, or bolster, the ALJ's missing analysis. Consider the issue of daily activities. The Government argues that one of the ALJ's reasons for discounting plaintiff's credibility was that she was "able to perform activities of daily living." Dkt. #19 at 5. The Government then describes two separate "daily activity" reports completed by plaintiff, one in August 2012 (Ex. 4E) and the other in February 2013 (Ex. 7E).[3] Based on these reports, the Government then lists the specific activities that plaintiff did, such as

---

[3] In its brief, the Government indicates that the latter document was completed in November 2012, but plaintiff's signature is dated February 19, 2013. R. 259. The specific date is not material to this analysis.

taking care of her grandson on occasion or watching her daughter's softball games. But the problem with this line of argument is that the ALJ never discussed, or even referred to, these documents. In other words, the ALJ's opinion did not do what the Government did in its brief—namely, delve into the specific details from multiple pieces of evidence to justify a broader legal assertion. The fact that the Government sought to add this additional evidence shows that the Government realizes the ALJ's opinion lacks it.

To cite another example, the Government also notes that the ALJ referred to certain normal findings from doctor visits. However, this argument obscures the fact that the ALJ mostly just summarized this evidence, along with other evidence, and did not consistently *analyze* it, leaving it unclear when and why particular pieces of evidence supported the larger assertions being advanced. The Government attempts to fill this void, as illustrated by the following sentence: "The ALJ considered medical records from May 2012 showing that Underwood had a normal muscle tone and strength, finger-to-nose touching, as well as normal light touch, pinprick, and sensation testing, *which is contrary to Underwood's testimony that she currently cannot stand for more than 20 minutes, walk half a block, and cannot go anywhere after she grocery shops*." Dkt. #19 at 4 (emphasis added). The italicized language was not in the ALJ's opinion but was added by the Government. Here again, the Government is attempting to fix the ALJ's opinion, in this instance by making the analysis explicit where it was only latent. These assertions, however, violate *Chenery*.

More broadly, it is not just the ALJ's credibility rationale that is fuzzy to this Court, but also the overarching reasons why the ALJ found plaintiff was disabled after August 1, 2013 but not before then. The ALJ only briefly discussed this issue toward the end of the opinion (*see* R. 18), and apparently determined that plaintiff's condition worsened sometime in 2013. But this

5

explanation is terse and not explained with any detail. For all the above reasons, the Court finds that the ALJ's credible rationales remain obscure. On remand, the ALJ should make an explicit credibility analysis following the new Social Security Ruling 16-3p, 2016 WL 1119029 (effective March 28, 2016).

Having found that a remand is justified based on this first argument, the Court will address the second argument more briefly, finding it also supports a remand. The second argument focuses on the Step Five finding that there were sufficient jobs in the national economy for someone with plaintiff's RFC. Although plaintiff's argument has several sub-parts, it can be boiled down to the claim that there were too many ambiguities in hearing testimony.

This Court agrees. After reading the relevant portion of the transcript several times, the Court still has difficulty in following the arguments and understanding precisely what the medical expert, the VE, and the ALJ concluded. Perhaps the best way to convey this point is to quote from the exchange, which is reminiscent of exchanges between Basil Fawlty and Manuel. *See* www.imdb.com/character/ch0023125/quotes. The following portion of the transcript focuses on plaintiff's hourly limitations for sitting, standing, and walking, as well as whether she would need to intermittently walk around, and begins with the ALJ asking questions of Dr. Savage, followed by plaintiff's counsel asking questions, and ends with several questions from the vocational expert:[4]

> Q   And could you describe [the] appropriate RFC, in your opinion?
>
> A   Yes. I think that she would be limited to lifting frequently up to 10 pounds and occasionally 20 pounds; carry with the same limitations; sitting, six out of eight hours; stand, walk six out of eight hours, but two of those – two hours related to standing, and the remainder to a slow walk. So that would be how I would break down the stand/walk. []
>
> ALJ:   Counsel, any questions for the medical expert?

---

[4] Some portions of the exchange dealing with other limitations not relevant here have been omitted.

> ATTY: Yeah. Thank you. []
>
> Q   I'd just like to go back to the stand/walk limitation. You said two hours of standing. Is that standing still, like, at a workstation?
>
> A   Or it could be a very – essentially, standing still, as I conceive it, and vocational discipline would have maybe a different view, but standing would be pretty much in just a standing position with only rare significant walking, and walking – the walking part of the combination would be a slow, easy walk. It should not be time pressured.
>
> Q   Okay. So at one time, in your opinion, how long is that standing? I guess that's the part I'm a little unclear with.
>
> A   Well, I think that she doesn't – from what I saw in the record, I don't think that she would need more than just standard breaks, and so that would be how I would look at it, which, I think, are, like, every two hours in a workplace setting.
>
> Q   Like, could only stand for two hours total throughout the day?
>
> A   No, I'm sorry. I said walk for two hours and [stand?] for four, I believe.
>
> Q   I heard it two hours standing, six hours slow walk.
>
> A   I'm sorry. It must have – Oh, I meant four hours standing, two hours walking. I'm sorry. Because the walking would pose more stress, and I think that's why it makes sense that it would be limited –
>
> VE:   So they're on their feet six hours?
>
> [A]   Yes. Stand/walk six hours with the breakdown as I mentioned. Four hours standing, two hours walking.
>
> VE:   Still doesn't make sense.

R. 58-61.[5] This exchange conveys this uncertainty, which continued into the subsequent testimony and into the hypothetical questions posed to the vocational expert. In the hypothetical, the ALJ restricted plaintiff to "standing and walking [] six elevated hours," which the ALJ defined as "light RFC." R. 66. Based on this hypothetical, the vocational expert stated that

---

[5] When a VE says that an ME's RFC does not make sense, a reasonable ALJ would obtain a true clarification of the testimony.

plaintiff could work as a hand packer, assembler, or hand sorter. However, in response to questions from plaintiff's counsel, the vocational expert stated that these jobs would not be available if plaintiff "had to walk away from the workstation." R. 67.

The Court cannot follow this line of testimony or the various distinctions and qualifications going back and forth. Put differently, the Court is not confident the participants fully understood each other and were on the same page. This conclusion is further supported by the Government's response brief. Although the Government argues that these discrepancies can be discounted as merely harmless errors, the Government still concedes that both the medical expert and ALJ had to make various "clarifications" during this testimony. Dkt. #19 at 6 (referring to the "ME"'s subsequent clarification" and noting that the ALJ "clarified" certain other facts). The Government recognizes that this portion of the testimony is, to put it mildly, confusing. As for the question of whether plaintiff would have to intermittently walk throughout the work day, a qualification that if true the vocational expert testified would preclude all jobs, the Government points to Dr. Savage's testimony that "standing would be pretty much in just a standing position with only rare significant walking, and [] the walking part of the combination would be a slow, easy walk." *Id.* (quoting from R. 60). Again, this testimony contains ambiguous and vague statements. It is not clear how the expert was defining "rare," "significant," "easy," and "slow," nor what all these terms collectively add up to in a practical sense. Rather than attempt to further parse these statements and attempt to resolve them through the harmless error doctrine, it is better to leave these issues for the ALJ who can provide accurate and complete clarification on remand.

Based on both of the above arguments, the Court finds that a remand is appropriate so that these issues can be addressed with further proceedings on remand. The Court will not

remand with an order that these benefits must be paid, which is plaintiff's preferred remedy, because the above-described uncertainties make such a conclusion impossible. However, given the relatively small stakes involved, the Court encourages the parties to consider whether this matter could be settled rather going through another full round of administrative proceedings.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: December 20, 2016    By: _____
Iain D. Johnston
United States Magistrate Judge